POSNER, Circuit Judge.
We have consolidated five (!) appeals by Metropolitan Life Insurance Company from adverse orders in a bankruptcy proceeding in which Metropolitan is the principal creditor. The debtor, James Wilson Associates (JWA), is a limited partnership that built and operates an office building in Madison, Wisconsin, and that in 1973 .had borrowed $3.9 million from Metropolitan, secured by a first mortgage, with an assignment of rents as additional collateral. Later it borrowed more money, against a second mortgage (and assignment of rents) now held by First Nationwide Bank. The balance outstanding on the two mortgages is roughly $4.6 million. In 1976 JWA sold the building for $7 million under a land contract to JWP Investors, another and (despite the similar initials) unrelated limited partnership, which leased the building back to JWA. Although the purpose of the sale and lease back was to finance JWA’s operation of the building rather than to transfer control, the transaction created a genuine lease under Wisconsin law because it did not vest title in JWA at the lease’s termination. In re Spring Valley Meats, Inc., 94 Wis.2d 600, 609-10, 288 N.W.2d 852, 856 (1980); American Industrial Leasing Co. v. Moderow, 147 Wis.2d 64, 70-71, 432 N.W.2d 617, 620 (Ct.App.1988).
JWP Investors did not assume the mortgages; JWA remained liable under them, and eventually defaulted. In 1990 the two mortgagees brought foreclosure suits in a Wisconsin state court, which at the request of both appointed a receiver to collect the rents from the building’s tenants and enjoined the tenants from paying rent to anyone else. Three weeks later JWA filed for bankruptcy under Chapter 11 of the Bankruptcy Code, and in its new status as debt- or in possession resumed collecting the tenants’ rents because the bankruptcy filing automatically stayed all judicial proceedings against the debtor, including the receivership. 11 U.S.C. § 362(a). Metropolitan moved to lift the stay with regard to the receivership, arguing that the lease was not an asset of the bankrupt estate.
A lease is, with regard to its unexpired portion, an executory contract; and a trustee in bankruptcy (or debtor in possession, as here) is free to repudiate without liability the debtor’s executory contracts, expressly including any unexpired leases. 11 U.S.C. § 365(a). But he doesn’t have to repudiate them; he can if he prefers assume them, in which event they are assets of the bankrupt estate. Section 365(d)(4) of the Bankruptcy Code provides, however, that if the trustee or debtor in possession does not either assume or reject an unexpired lease of nonresidential real property of which the debtor is the lessee within sixty days after the filing of the petition for bankruptcy (the statute says, within sixty days after “the order for relief,” but the filing of the petition for bankruptcy is deemed such an order, 11 U.S.C. § 301; In re Elm Inn, Inc., 942 F.2d 630, 633 (9th Cir.1991) — and rightly so, since the automatic stay kicks in then), the lease is deemed rejected and the trustee or debtor must immediately surrender the property to the lessor. The bankruptcy judge can extend the time for this election, at least if he does so within the sixty-day period (the circuits are divided over whether he can do so later). 11 U.S.C. § 365(d)(4); In re American Healthcare Management, Inc., 900 F.2d 827, 829-30 (5th Cir.1990). But there was no extension here.
*165 Metropolitan argued that JWA had missed the deadline and therefore that the lease was not a part of the estate in bankruptcy, so naturally the stay had to be lifted. JWA responded by submitting a document which states that JWP Investors had continued since the bankruptcy to receive the monthly rental specified by its lease to JWA and that the parties considered the lease to be continuing. Was this an assumption? Loosely speaking, it was. But it was not executed within the sixty-day period. And no formal motion was filed asking that the bankruptcy judge approve the assumption, as the bankruptcy rules require. Bankr.R. 6006(a), 9014; Sea Harvest Corp. v. Riviera Land Co., 868 F.2d 1077 (9th Cir.1989); In re BDM Corp., 71 B.R. 142 (Bankr.N.D.Ill.1987); In re Austin, 102 B.R. 897, 899 (Bankr.S.D.Ga.1989). Moreover, the purported assumption changed the lease from one of fixed term to one from month to month, and ordinarily such a modification would be inconsistent with an assumption; a provision that allows the lessee’s obligations to be assumed by another does not allow the terms of the lease to be altered to the lessor’s detriment. In re Chicago, Rock Island & Pacific R.R., 860 F.2d 267, 272 (7th Cir.1988); In re Gardinier, Inc., 831 F.2d 974, 975 n. 1 (11th Cir.1987). But here the lessor is not objecting, Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.1985) (per curiam), the creditor (Metropolitan) does not have an interest in the lease, and these circumstances led both the bankruptcy judge and the district judge to deny the motion to lift the stay on the ground that Metropolitan did not have standing to complain about a violation of section 365(d)(4).
One appeal is from this order; the next two appeals challenge three other orders affirmed by the district judge. One turned down Metropolitan’s request, premised on the argument that JWA had acted in bad faith in filing for bankruptcy, to lift the automatic stay with regard to the foreclosure proceeding. Another order allowed JWA to pay attorney’s fees incurred in administering the bankrupt estate (an estate consisting be it noted solely of the debtor’s interest in the office building) out of the tenants’ rents. The third order allowed a portion of those rents to be diverted to the account of First Nationwide, the second mortgagee, to protect its lien. The bankruptcy judge had determined that Metropolitan had adequate protection even after these diversions. The office building alone § (that is, ignoring the past rentals, deposited in the debtor’s account, out of which the diversions have been made) has a market value of $6 million, while Metropolitan, the senior lienor, is owed only about $3.2 million on its mortgage, including interest.
The final two appeals concern the plan of reorganization that JWA submitted and that the bankruptcy judge, affirmed by the district judge, approved after the other appeals had been filed. One appeal attacks the plan itself, as unfair to Metropolitan. The other allows additional attorneys’ fees to be paid out of the tenants’ rent; Metropolitan concedes that this appeal must be decided the same way as the appeal from the previous such order.
The plan of reorganization envisages that all creditors will be paid in full over a period of years, with interest. And all the creditors voted for the plan except Metropolitan, which under the plan is to receive, for seven years, payments based upon a 25-year amortization of its loan at an interest rate of 2.5 percent above the yield on current seven-year U.S. Treasury notes and, at the end of the seven years, a balloon payment for the balance; but JWA is to have two years to raise the money for the balloon payment.
Five appeals are a lot in one case and three of them were filed before the case ended with the approval of the plan of reorganization. This proliferation of interlocutory appeals may seem to do extraordinary violence to the principle of finality, which governs appeals to the courts of appeals in (most) bankruptcy cases, as it does in other cases. Compare 28 U.S.C. § 158(d) with 28 U.S.C. § 1291. Yet, as we shall see, a decision by the Supreme Court handed down after the argument in this case establishes that at least the two ap *166 peals that challenged the automatic stay were within our appellate jurisdiction when filed. Connecticut National Bank v. Germain, — U.S. -, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). All five appeals are incontestably within that jurisdiction now, since once a final judgment is entered and appealed, the appellant can challenge any interlocutory order that the judgment has not made moot. Weir v. Propst, 915 F.2d 283, 286 (7th Cir.1990).
The automatic stay is an injunction. Here it not only stopped the foreclosure proceedings in their tracks; it wrested control over the building and the building rentals from the hands of the receiver. All four orders challenged by the first three appeals rebuffed Metropolitan’s efforts to dissolve or modify this injunction by revesting the receiver with control over the rentals or, at the very least, blocking access to the rentals by the debtor in possession. Section 1292 of the Judicial Code makes orders granting or denying motions to grant, deny, modify, or dissolve preliminary injunctions appealable without regard to finality, 28 U.S.C. § 1292(a)(1); and Connecticut National Bank holds that section 1292 applies to appeals in bankruptcy cases even though the final judgments in such cases normally are appealable under 28 U.S.C. § 158(d) rather than under 28 U.S.C. § 1291. But it is not clear that the automatic stay should be classified as a preliminary rather than as a permanent injunction. Although section 158(d) uses the same word, “final,” as section 1291, it has been understood in light of the history and attributes of bankruptcy proceedings to mean the word more loosely. In ordinary federal litigation, a final judgment is the order that winds up the case except for some details such as the assessment of costs or (where authorized) attorney’s fees that are, for practical reasons, considered separate from the main proceeding. A bankruptcy proceeding, in contrast, is often a conglomeration of separate adversary proceedings that, but for the status of the bankrupt party which enables them to be consolidated in one proceeding, would be separate, stand-alone lawsuits. Parties to those separate proceedings should not have to wait for the end of the entire bankruptcy proceeding before they can appeal, and therefore finality in bankruptcy has been interpreted to embrace the final decision in any adversary proceeding that, but for its bankruptcy setting, would be a separate suit. In re Saco Local Development Corp., 711 F.2d 441, 443 (1st Cir.1983); In re Riggsby, 745 F.2d 1153, 1154 (7th Cir.1984); In re Morse Electric Co., 805 F.2d 262, 264-65 (7th Cir.1986); Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 748 (7th Cir.1989); In re Szekely, 936 F.2d 897, 899-900 (7th Cir.1991).
As a corollary, orders refusing to lift or modify the automatic stay are held to be final. In re Boomgarden, 780 F.2d 657, 660 (7th Cir.1985); In re Sonnax Industries, Inc., 907 F.2d 1280, 1283-85 (2d Cir.1990); Edith H. Jones, “Bankruptcy Appeals,” 16 Thurgood Marshall L.Rev. 245, 256-57 & n. 48 (1991). At first glance this conclusion seems strained, because no one supposes that a preliminary injunction winds up a case — that is why we have section 1292(a)(1). But at second glance we see that it is the analogy of the automatic stay to a preliminary injunction that is strained. (Analogy is a potent source of confusion in law.) The automatic stay, unless lifted, remains in effect until the entire bankruptcy proceeding is wound up — at which point, ordinarily, the debtor is discharged and whatever proceedings were stayed become moot. An injunction that continues in effect until mootness supervenes could be thought, if not permanent, at least closer to the permanent than to the preliminary end of the injunctive spectrum. So at least the courts have held without dissent and we are not minded to disturb the consensus. Of course, now that section 1292(a)(1) has been held applicable to bankruptcy appeals, it hardly matters whether the automatic stay is a preliminary or a permanent injunction. If the former, challenges to it are appealable to this court under that statute, and if the latter they are appealable under section 158(d). (“Permanent” doesn’t quite mean “final,” but it’s close enough. University Life Ins. Co. *167 v. Unimarc, Ltd., 699 F.2d 846, 849 (7th Cir.1983).)
As for the second and third appeals, had they stood alone it would be doubtful that they could be considered final even under the relaxed usage prevailing in bankruptcy. Cases can be cited on both sides of the question. Compare In re Boddy, 950 F.2d 334, 336 (6th Cir.1991), and In re Regency Woods Apartments, Ltd., 686 F.2d 899 (11th Cir.1982), with In re Hilligoss, 849 F.2d 280, 281 (7th Cir.1988); In re Charter Co., 778 F.2d 617 (11th Cir.1985), and In re Alchar Hardware, 730 F.2d 1386, 1388-89 (11th Cir.1984) (per curiam), and all are distinguishable from our case. No matter; each of the four orders attacked in the first three appeals was ap-pealable even before the bankruptcy proceeding ended with the approval of the plan of reorganization, because each merely blocks a different aspect of Metropolitan’s multi-front attack on the stay. One allows JWA to pay its lawyers for expenses in operating the building; without such a dispensation JWA might find it impossible to continue to operate the building and would have to turn it over to Metropolitan’s receiver — someone has to collect the rents. Another order allows the second mortgagee to obtain a portion of the rents in order to protect its lien; Metropolitan’s objection is that the receiver should be collecting the rents. The other two orders are direct attacks on the stay. So in various guises, as will become clearer when we discuss the merits, Metropolitan is arguing in these first three appeals that the stay must be lifted to allow it to do with the building as it will — foreclose its mortgage and thereby cause the building to be sold and in the meantime collect the rents and apply them — all of them — to the unpaid balance of its mortgage. The grounds are various but they are all grounds for ordering the automatic stay to be lifted, and that stay, as we have explained, is an appealable order.
Another jurisdictional question, though, is whether the approval of the plan of reorganization has made the challenge to the automatic stay moot. The stay is automatically lifted when the plan is approved and the bankrupt discharged. 11 U.S.C. § 362(c); McKinney v. Waterman S.S. Corp., 925 F.2d 1, 4 (1st Cir.1991). Still, it is always possible that we might disapprove the plan and thus send the case back for further proceedings — and at that point the validity of the orders refusing to lift the stay would become critical. But all this is of little significance because, as will soon become apparent, the grounds on which Metropolitan is challenging the stay are among the grounds on which it is challenging the plan.
So let us turn to the merits (though we shall quickly encounter there another jurisdictional issue). Metropolitan’s position is founded on the adage that liens pass through bankruptcy unaffected. Long v. Bullard, 117 U.S. 617, 620-21, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886); Dewsnup v. Timm, — U.S. -, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992); In re Official Committee of Unsecured Creditors, 943 F.2d 752, 754 (7th Cir.1991); In re Lindsey, 823 F.2d 189, 190 (7th Cir.1987). Bankruptcy, when viewed from the standpoint of creditors, is intended for the protection of unsecured creditors from the bankrupt and from each other (the unseemly creditors’ scramble that may diminish the aggregate value of the bankrupt’s assets). When viewed from the debtor’s standpoint, it is intended for his protection against the unsecured creditors. The secured creditor is supposed to be able to waive his claims in bankruptcy and proceed directly to the liquidation of his security— that is what it means to say that liens pass through bankruptcy unaffected. In re Excello Press, Inc., 890 F.2d 896, 898 (7th Cir.1989); J. Catton Farms, Inc. v. First National Bank, 779 F.2d 1242, 1247 (7th Cir.1985). Metropolitan had a security interest in the rents as well as in the building itself, and the orders complained of, culminating in the plan of reorganization, have frustrated its efforts to use the state court receivership to take control of the rents. Not only has the receivership been enjoined but portions of the rents have been siphoned off to protect a junior creditor and to pay expenses of administering the bankrupt estate. An order by a bankruptcy *168 court extinguishing a creditor’s security interest is a taking of property within the meaning of the just compensation clause of the Fifth Amendment, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); Armstrong v. United States, 364 U.S. 40, 44-46, 80 S.Ct. 1563, 1566-67, 4 L.Ed.2d 1554 (1960); cf. United States v. Security Industrial Bank, 459 U.S. 70, 75-78, 103 S.Ct. 407, 410-12, 74 L.Ed.2d 235 (1982), and no one has offered Metropolitan compensation for taking away its security interest in the rents.
All this is very powerful but if accepted would have the peculiar consequence that Metropolitan could use its assignment of rents to pay itself, out of those rents and over as many years as it took, the principal and interest that is due it on its mortgage, and during this entire period there would be nothing for other creditors, or for the expense of administering the bankrupt estate, because the rents are the debtor’s only income. Metropolitan would be entitled to do this under the view of the law that it is advancing even though its mortgage is comfortably oversecured — the building being worth almost twice as much as the unpaid balance of its mortgage, including interest, to which, as an overse-cured creditor, Metropolitan is entitled. 11 U.S.C. § 506(d); In re Lapiana, 909 F.2d 221, 222-23 (7th Cir.1990). In holding out for the right to enforce its lien in this fashion, Metropolitan may be jockeying for strategic advantage. It would be as well off with a sale of the building (which it does not propose, although it does want to foreclose its mortgage and the usual sequel to that would be a judicial sale) or with the extension of its loan at an adequate rate of interest, the aim of the plan of reorganization. But neither remedy would impose as much pain on other creditors, such as First Nationwide, and on the debtor, as would lifting the automatic stay or dismissing the bankruptcy proceeding altogether. The likelihood of Metropolitan’s carrying through with such a threat as we have described may be small, as we shall see; but we hesitate to conclude that the law allows Metropolitan to make the threat at all.
Of course if the debtor in possession did not assume the lease, the rents are not an asset of the bankrupt estate and there is no longer any anomaly in denying the debtor’s creditors any share of the rents. This is the issue in the first appeal. Metropolitan argues that since there was no formal assumption the lease is to be deemed rejected, the debtor is out, and not only must the stay of the receivership be lifted because it is intended to protect property of the debt- or, not of other people, but the plan of reorganization must be disapproved because it attempts to regulate the use of property that is not part of the bankrupt estate.
A secured creditor dragged into a bankruptcy proceeding against his will by the automatic stay provision of the Bankruptcy Code has a tangible financial interest in getting his security out from under the jurisdiction of the bankruptcy court so that he can foreclose it (the receivership in effect foreclosed the rent assignment). That is interest enough to confer standing in an Article III sense. But this is not the only sense of standing that can bar a litigant from a federal court. To have standing to invoke a statute you must be one of the persons whom the statute is intended to protect. Tucker v. Department of Commerce, 958 F.2d 1411, 1416 (7th Cir.1992), and cases cited there. So unless the provision of the Bankruptcy Code relating to the assumption of leases was intended for the protection of other persons as well as lessors, Metropolitan cannot use it to challenge the stay of the receivership or the plan of reorganization.
Before section 365(d)(4) was added to the Bankruptcy Code in 1984, a Chapter 11 bankrupt who was a lessee had until the approval of the plan of reorganization to decide whether to assume the lease even if he had vacated the leased premises and stopped paying rent, so that until that approval the landlord might have to allow the premises to remain vacant lest the lessee decide to exercise his right. In re American Healthcare Management, Inc., supra, *169 900 F.2d at 830. A further hardship to the landlord was that the automatic stay prevented him from suing for the unpaid rent. (After assumption, he would be a post-petition creditor entitled to a high priority for his claim of rent. Douglas G. Baird & Thomas H. Jackson, Cases, Problems, and Materials on Bankruptcy 275 (2d ed. 1990).) The 60-day rule introduced in 1984 for nonresidential real-estate leases of Chapter 11 debtors was already the rule for Chapter 7 bankrupts. 11 U.S.C. § 365(d)(1). A sensible rule, it makes whoever controls the debtor’s property put up or shut up within a reasonable time; non-assumption is treated as rejection in order to prevent the lessee from defeating the provision simply by dragging his feet.
Although the only two appellate cases that we have found on the question divide over creditor standing to enforce the 60-day rule, compare International Trade Administration v. Rensselaer Polytechnic Institute, 936 F.2d 744, 747 (2d Cir.1991) (yes, standing), with In re Dein Host, Inc., 835 F.2d 402 (1st Cir.1987) (no standing), we find it very difficult to see who might be an intended beneficiary of this provision other than the lessor, and we therefore side with the First Circuit. The Second Circuit considered standing only in its Article III sense: did the creditor have a tangible stake in enforcing the rule? And of course it did, as Metropolitan does here. But there is more to standing. If as here the lessor is content to allow the lease to continue, no other creditors suffer a harm of the kind that the provision was intended to head off. A rule that allows other creditors to complain that the lease was not assumed will simply provoke arid controversies over what formalities should be considered adequate for the assumption of a lease — a matter between lessor and lessee. Metropolitan does not argue that there was collusion between lessee and lessor — that JWP Investors is a cat’s paw of JWA. And it has abandoned its request for the appointment of a trustee to take control of the building away from JWA. Its position thus is hyperteehnieal; it is caviling about formalities intended for the protection of other people. This is inev-itable if a creditor is allowed to challenge the assumption of a lease. The issue of the creditor’s standing matters only when the lessor is content with the lessee’s continuing under the lease; otherwise the lessor, whose standing is unquestionable, would be challenging the alleged assumption. The formalities of assumption are really no one else’s business, so that here the concept of standing rather than blocking access to the merits screens out a set of inherently meritless claims.
We must consider, however, the bearing of section 1109(b) of the Bankruptcy Code, which provides that a “party in interest [in a bankruptcy proceeding], including ... a creditor ... may raise and may appear and be heard on any issue in a case under this chapter.” Provided that the creditor has a stake in the issue, as Metropolitan does, there could be no objection founded On Article III to such a grant of standing. But we do not think that this section was intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim, although a literal reading of section 1109(b) would support such an interpretation. We think all the section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains, thus making explicit what is implicit in an in rem proceeding — that everyone with a claim to the res has a right to be heard before the res is disposed of since that disposition will extinguish all such claims. Cf. 5 Collier on Bankruptcy ¶ 1109.02, at pp. 1109-16 to 1109-32 (Lawrence P. King ed., 15th ed. 1991); United States v. Tit’s Cocktail Lounge, 873 F.2d 141, 143 (7th Cir.1989) (per curiam). Section 365(b)(4) confers no legally protected interest on Metropolitan in the lease between JWP Investors and the bankrupt, and section 1109(b) therefore does not entitle Metropolitan to make an issue of the assumption of the lease.
*170 We have not, however, considered the possible bearing of the receivership on Metropolitan’s standing. Remember that a receiver was appointed to enforce JWA’s assignment of rents to Metropolitan. The receivership was enjoined when the petition for bankruptcy was filed, but if by virtue of the receivership JWP Investors was ousted as the lessor in favor of Metropolitan, then Metropolitan could reject the lease and would have standing to appeal if the rejection were not honored. Although Metropolitan does not argue for standing on this ground, its brief does contain a suggestion that the receivership by terminating JWP Investors’ interest can-celled any lease that JWA could have assumed. The suggestion is insufficiently developed to require us to consider it, for a merely skeletal argument does not preserve an issue for review. United States v. Harvey, 959 F.2d 1371, 1376 (7th Cir. 1992); United Rope Distributors, Inc. v. Seatriumph Marine Corp., 930 F.2d 532, 536 (7th Cir.1991); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) (per curiam); United States v. Giovannetti, 919 F.2d 1223, 1230 (7th Cir.1990). That principle has particular bite in a case such as this where the merits of the skeletal argument are difficult to assess. Even if (and this is unclear) the receiver stepped into the shoes of the landlord, JWP Investors, as well as the lessee, JWA, the receivership was enjoined when the bankruptcy petition was filed. The natural inference is that the receiver stepped out of whatever shoes he had stepped into and JWP Investors resumed its landlordship — and it was after that that JWA assumed the lease. But all this assumes that the automatic stay can operate in favor not only of the debtor (JWA) but also of a third party (JWP Investors), and the rule is contra. Pitts v. Unarco Industries, Inc., 698 F.2d 313 (7th Cir.1983) (per curiam); In re K & L Ltd., 741 F.2d 1023, 1030 (7th Cir.1984). There may, however, be an exception where the debtor is an indispensable party to the litigation, as suggested in United States v. Nicolet, Inc., 857 F.2d 202, 203 (3d Cir.1988), and In re Comcoach Corp., 698 F.2d 571, 574 (2d Cir.1983), which JWA might or might not be. Compare id. at 574 with Wisconsin Finance Corp. v. Garlock, 140 Wis.2d 506, 512, 410 N.W.2d 649, 651 (Ct.App.1987). The thinking here is that if the debtor is an indispensable party, protected by the stay from involvement in the litigation, the litigation cannot proceed in his absence and therefore must be stayed as against the third party, here JWP Investors, as well. However all this may be, Metropolitan would have had to move to lift the stay as to JWP Investors, and it did not.
Obviously this is a richly complex issue, and it was Metropolitan’s burden to develop it in adequate depth to enable its opponent and this court to evaluate it. A very large corporation, Metropolitan is well able to afford the best counsel. It has filed five appeals in this case and hundreds of pages of briefs. We won’t rewrite its appeal briefs for it.
Our resolution of the question of standing brings to the fore Metropolitan’s argument that the entire bankruptcy proceeding is an abuse of the Bankruptcy Code because the sole purpose is to squirrel away the rents where the receiver can’t get at them. In so arguing Metropolitan is appealing to section 1112(b) of the Code, which authorizes the bankruptcy judge to dismiss a bankruptcy proceeding for want of good faith. What should count as bad faith in this setting is unclear. It is not bad faith to seek to gain an advantage from declaring bankruptcy — why else would one declare it? One might have supposed that the clearest case of bad faith would be filing for bankruptcy knowing that one was not bankrupt, but the Bankruptcy Code permits an individual or firm that has debts to declare bankruptcy even though he (or it) is not insolvent. In re Johns-Manville Corp., 36 B.R. 727, 732 (Bankr.S.D.N.Y.1984); Baird & Jackson, supra, at 86-129. (These are usually cases of impending insolvency.) The clearest case of bad faith is where the debtor enters Chapter 11 knowing that there is no chance to reorganize his business and hoping merely to stave off the evil day when the creditors take control of his property. Ca- *171 rolin Corp. v. Miller, 886 F.2d 693, 700-03 (4th Cir.1989). There is no indication of that here. JWA defaulted on its mortgage payments, and when Metropolitan procured the appointment of a receiver to receive the rents this precipitated JWA into insolvency; it had no income outside of the tenants’ rentals now to be handed over to the receiver out of which to pay its other creditors, and no unencumbered assets out of which to pay them either. Could it be that JWA defaulted on its mortgages in order to set in motion a chain of events that would lead to the specific actions of which Metropolitan complains — the automatic stay, the diversion of rents to lawyers and to the second mortgagee, and now the plan of reorganization that relieves JWA, for a time anyway, from the consequences of its defaulting on the first mortgage? Maybe so, but Metropolitan has presented no evidence that it is so.
And if this is a proper bankruptcy proceeding (and if the rents are the property of JWA, because, at least between it and JWP Investors, the lease was validly assumed) it illustrates that the adage that liens pass through bankruptcy unaffected cannot be taken at face value. In re Lindsey, supra, 823 F.2d at 190-91. Being subject to the automatic stay, Metropolitan cannot, without leave of the bankruptcy court, enforce its security interests either in the building itself or in the rentals that the building’s tenants pay. In re Vitreous Steel Products Co., 911 F.2d 1223, 1231 (7th Cir.1990); In re Excello Press, Inc., supra, 890 F.2d at 898; In re Met-L-Wood Corp., 861 F.2d 1012, 1015 (7th Cir.1988); Boston & Maine Corp. v. Chicago Pacific Corp., 785 F.2d 562, 565 (7th Cir.1986). So its liens are affected by bankruptcy. But is it permissible to bite into them in order to pay attorney’s fees and to protect the interest of another, but junior, secured creditor? We think so, given the overse-cured character of Metropolitan’s claim. A security interest is — a security interest. It is not a fee simple. United States v. Security Industrial Bank, supra, 459 U.S. at 76, 103 S.Ct. at 411. Metropolitan does not own a $6 million building or the rents that that building throws off month after month, year after year. It is just a creditor with a claim currently worth about $3.2 million that it has secured with liens against the building, and against the rents, to assure repayment. It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest. 11 U.S.C. §§ 362(d), 363(e); In re Hanna, 912 F.2d 945, 951 n. 9 (8th Cir.1990); In re Revco D.S., Inc., 901 F.2d 1359 (6th Cir.1990); In re Senior Care Properties, Inc., 137 B.R. 527 (Bankr.N.D.Fla.1992). It has every right to complain if the trustee or debtor in possession monkeys with the security in a way that endangers its claim, but it does not argue that its claim is endangered by any of the steps of which it so bitterly complains. There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected, here by another security interest (the first mortgage). In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir.1984). The absolute-priority rule is not violated, because the plan provides for Metropolitan to be paid in full with interest.
As an original matter one might think that a senior lienor should be allowed to do whatever he wants with his lien, and the junior lienors be damned. They can always buy out his interest at its face amount. But the conceded applicability of the automatic stay to suits by creditors, such as Metropolitan’s receivership action, as well as the fundamental principle that a creditor obtains only a security interest and not a fee simple no matter how the parties denominate his interest, shows that neither the Constitution nor the Bankruptcy Code requires so brutally simple an approach. The first lienor is entitled to the preservation of so much of his security interest as is necessary generously to secure his claim, but to no more. He may not paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security. We note the strategizing flavor of Metropolitan’s demand to be allowed to col *172 lect its debt over a period of years out of the rent rolls rather than by a prompt sale that would enable the debtor and the other creditors to liquidate their interests and go about their business — although the debtor and creditors could call Metropolitan’s bluff by offering it the full unpaid balance (principal and interest) of its mortgage.
What we have said disposes very largely of Metropolitan’s challenge to the plan of reorganization itself. Like the automatic stay to which the previous appeals object, the plan prevents Metropolitan from either foreclosing a mortgage conceded to be valid or enjoying the mortgagor’s rents under an assignment also conceded to be valid. It does make rather a mockery of the principle that liens pass through bankruptcy unaffected to force Metropolitan to extend its loan for seven years at an interest rate fixed by a court, when, the loan having been defaulted on, the unpaid balance became immediately due and owing. It is two years since Metropolitan sued to foreclose, and obtained a receivership; it will be seven years, at best, before the loan is repaid; it could well be longer because the plan of reorganization gives JWA two years after the loan comes due to find the money to make the balloon payment.
But the principle that liens pass through bankruptcy unaffected cannot be taken literally, as we have seen; and it is the law that, provided the plan of reorganization gives the secured creditor the “indubitable equivalent” of his secured interest, the bankruptcy judge can force the creditor to accept the exchange. 11 U.S.C. § 1129(b)(2)(A)(iii); In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir.1935) (L. Hand, J.); In re Sandy Ridge Development Corp., 881 F.2d 1346, 1349-50 (5th Cir.1989). Even more clearly than such questions as negligence and possession, moreover, the question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact, In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir.1986), and our review is therefore deferential. Since Metropolitan is in the business of making loans, it can hardly complain that its loan was extended, provided not only that the security is adequate (as it is) but also that the interest rate compensates it for the opportunity cost of its money and the risk of default. The bankruptcy judge thought that the seven-year Treasury bill rate plus 2.5 percent would do this, given the adequacy of the first mortgage as security for Metropolitan’s loan. It might appear that if the security is worth much more than the loan (almost twice as much here), the risk of default will be negligible and the interest bonus was therefore superfluous. But the appearance is misleading. The risk of default may be great. The borrower may use the difference between the value of the security and the loan secured by it to secure other loans. Nor is the risk of default a costless one to the secured creditor merely because his lien is oversecured. More important than the expenses of foreclosure (should there be a default) is the possibility that the security will decline in value over the life of the loan, here seven years, to the point where it is no longer adequate. Nevertheless the testimony of experts that the judge was authorized to credit confirmed that the value of the building is far in excess of Metropolitan’s lien, giving Metropolitan a considerable cushion against the impact of a default.
Metropolitan objects bitterly, however, to the exclusion of evidence that the building is in far worse state of repair than JWA acknowledges and is therefore worth much less than the plan assumes. The evidence had been obtained by a consulting engineer retained by Metropolitan’s expert witness, an architect who planned to testify about the physical condition of the building as reported to him by the consulting engineer. The bankruptcy judge was entitled to exclude the architect’s evidence as hearsay. An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him — information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented. Fed.R.Evid. 703. And in explaining his opinion *173 an expert witness normally is allowed to explain the facts underlying it, even if they would not be independently admissible. But the judge must make sure that the expert isn’t being used as a vehicle for circumventing the rules of evidence. Gong v. Hirsch, 913 F.2d 1269, 1272-73 (7th Cir.1990). The fact that inadmissible evidence is the (permissible) premise of the expert’s opinion does not make that evidence admissible for other purposes, purposes independent of the opinion. United States v. Grey Bear, 883 F.2d 1382, 1392-93 (8th Cir.1989). If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party’s lawyer told him, the lawyer cannot in closing argument tell the jury, “See, we proved X through our expert witness, A.” That was the kind of hand-off attempted in this case. The issue was the state of the building, and the expert who had evaluated that state — the consulting engineer — was the one who should have testified. The architect could use what the engineer told him to offer an opinion within the architect’s domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him — of becoming in short the engineer’s spokesman. Why Metropolitan did not call the engineer as a witness is unexplained, but it is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him).
Metropolitan has raised some other issues but we need not discuss them. Its objections to the confirmation of the plan of reorganization are encompassed by our discussion. We find no errors in the challenged rulings.
Affirmed.